IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 22, 2018

## STATE OF TENNESSEE v. LARRY ALLEN STUMBO

**Appeal from the Criminal Court for Sullivan County**
**No. S64262        R. Jerry Beck, Judge**

_____

### No. E2017-01405-CCA-R3-CD
_____

A Sullivan County jury convicted the Defendant, Larry Allen Stumbo, of especially aggravated kidnapping, aggravated rape, aggravated robbery, aggravated burglary, employing a firearm during the commission of a dangerous felony, evading arrest, and possession of a handgun by a convicted felon.   The trial court sentenced the Defendant to an effective sixty-year sentence.   On appeal, the Defendant contends that: (1) the trial court erred when it denied his motion for substitution of counsel; (2) the evidence is insufficient to support his convictions; (3) the trial court erred when it sentenced him; and (4) no hearing was held as required by T.C.A. § 39-17-1324 to determine the existence of a prior qualifying felony conviction to sustain the Defendant's conviction for possession of a handgun by a convicted felon.   After a thorough review of the record and applicable authorities, we affirm the trial court's judgments of conviction. We affirm the Defendant's sentences for all the convictions except employing a firearm during the commission of a dangerous felony.   For reasons contained herein, we vacate the sentence for the employing a firearm during the commission of a dangerous felony conviction and remand the case to the trial court for resentencing on that count.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**
**in Part; Vacated in Part and Remanded for Resentencing on Count 5**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and THOMAS T. WOODALL, J., joined.

Terry L. Jordan and Andrew J. Gibbons, Assistant District Public Defenders, Blountville, Tennessee, for the appellant, Larry Allen Stumbo.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; Barry P. Staubus, District Attorney General; and Joseph Eugene Perrin, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION
## I. Facts

This case arises from the Defendant breaking into the victim's home and raping her at gunpoint, following which he stole a television set and forced her into her vehicle and drove her to a nearby gas station. The Defendant was observed by law enforcement driving the victim's stolen vehicle after he dropped her off at the gas station; when officers pursued the Defendant, he failed to yield and, after wrecking the victim's vehicle, fled the scene. He was later found hiding in the woods behind a shopping center; a weapon was found nearby. For these offenses, a Sullivan County grand jury indicted the Defendant for especially aggravated kidnapping, aggravated rape, aggravated robbery, aggravated burglary, employing a firearm during the commission of a dangerous felony, evading arrest, and possession of a handgun by a convicted felon.

### A. Motion to Relieve Counsel

On the morning of trial, one of the Defendant's attorneys, Counsel Jordan, informed the trial court that the Defendant was not cooperating, refused to speak to his attorneys, and was requesting new counsel. The trial court recited a brief history of the case's multiple continuances and noted the untimeliness of the Defendant's request to relieve counsel. The Defendant was sworn in and testified that he had attempted to contact his attorneys leading up to his trial, but they were always busy or not in their offices. He stated that when his attorneys visited him in jail they would try to "coerce" him into pleading guilty and told him it would be in his best interest to take a plea based on the facts of his case. The Defendant stated that he understood he did not have to accept their advice but felt that their advice to him presented a conflict. He stated that he did not feel safe proceeding to trial based on their approach to this case. The Defendant said he understood that the attorneys had a duty to relay to him any plea offers made, but he felt their representation was ineffective because they were coercing him to plead guilty. The Defendant requested that he be appointed a new attorney that would be more "proactive" in representing him. The Defendant stated he had not spoken to his attorneys more than a few times in months.

Counsel Jordan testified that he and Counsel Gibbons had visited the Defendant the week prior to trial and several more times over the previous two weeks. He stated that counsels and the Defendant had "been at loggerheads" for a while. The Defendant had received discovery in the case but had refused to go over a portion of it with counsels because he no longer wanted them to represent him. Counsel Gibbons testified that no plea offer had been made by the State in this case, a fact which the State confirmed. The State pointed out that the victim's advancing age as well as the age of the case and

serious nature of the charges motivated them to move forward with the case.

The trial court reiterated that, because the case had been on the docket "for years," the Defendant had had sufficient time to make his motion to relieve counsel. The Defendant stated that his trust in his attorneys had been broken. The trial court made a finding that the Defendant was not credible and, again citing the age of the victim, seventy-three years, and the age of the case, denied the Defendant's motion.

## B. Trial

At the Defendant's trial, the following evidence was presented: Angela Thomas testified that she was a 911 operator and that she answered a call on February 6, 2014 at 11:20 p.m. from the victim. The victim was extremely upset and could "hardly talk." A recording of the 911 call, which is not included in the record, was played aloud for the jury. Based on the victim's description of her vehicle that had been stolen by the Defendant, Ms. Thomas issued a "BOLO" (Be On The Lookout) for the vehicle over the police radio.

Justin Branson testified that he worked for the Bristol Police Department on the date of this incident and responded to the victim's home where he came into contact with the victim, whom he described as upset and hyperventilating. The victim told Officer Branson that she had been inside her home, lying on her bed when a masked white man entered her bedroom and raped her at gunpoint. He then made her shower, after which he took a television from inside her residence and then forced her to ride in her car with him until he dropped her off at a gas station.

Other officers responded to the scene, prompting Officer Branson to leave the scene in his police vehicle to monitor vehicle traffic close by. Officer Branson saw a vehicle matching the description provided in the BOLO, and observed a white male driving. He pursued the vehicle in his police car until it accelerated away at a high rate of speed. He later was directed to the scene of a vehicle crash which turned out to be the victim's vehicle. Law enforcement found a television in the backseat of the victim's stolen vehicle.

On cross-examination, Officer Branson stated that he did not see any injuries on the victim's body when he encountered her at her home. He stated that he learned the vehicle had crashed less than two minutes after he discontinued his pursuit of it; the driver was not present at the scene of the crash.

Matthew Cousins testified that he was employed by the Bristol Police Department and was on duty when the dispatcher issued the BOLO issued for the victim's vehicle

3

over the police radio. He later heard Officer Branson's communication over the radio that Officer Branson had momentarily pursued the vehicle. Officer Cousins encountered the victim's vehicle driving toward him, observing that there was a white male driving. The officer activated his emergency lights, but the vehicle failed to yield, and he discontinued the pursuit for safety reasons. He eventually found the vehicle crashed into a telephone pole; the driver was not present. There was a large-screen television in the back of the vehicle and extensive damage to the vehicle itself.

The victim testified that she was seventy-three years old and that prior to February 6, 2014, her granddaughter was romantically involved with the Defendant. Their relationship ended in December 2013. While the Defendant dated her granddaughter, he did not have a vehicle and so the victim provided transportation for him as well as food. As a result of him spending time at the victim's house, the Defendant knew where the victim kept a key to her house hidden.

On February 6, 2014, the victim went to sleep in her bedroom after locking her house. At some point she was awoken by an intruder feigning a foreign accent saying, "Turn over." The victim opened her eyes and saw a gun pointed at her. The intruder holding the gun was wearing a mask and gloves. The intruder asked the victim for her keys at which point she handed them to him as well as some cash. The intruder asked where the victim's granddaughter was, and the victim replied that her granddaughter was home with her mother. Addressing the victim by name, the intruder then told her that a contractor had offered him two million dollars for the victim's granddaughter's "head." The intruder asked where the victim's granddaughter was, and the victim gave him the name of the apartment complex. The victim, however, was incorrect about the name of the complex, and the intruder corrected her, leading her to surmise that he knew where her daughter lived.

The intruder motioned for the victim to leave her bedroom and followed her out. While they were standing in the victim's living room, the intruder asked the victim how much the television in the room cost. While pointing his gun at the victim, the intruder led her out of her house and got into her vehicle. The victim provided a description of her truck, the same description provided by the police dispatcher over the BOLO call. Inside her vehicle, the victim complained of being cold and the intruder allowed her to go back inside her house to get more clothes; he followed her the entire time "with the gun." As the victim was getting dressed, the intruder said, "Take your clothes off." The victim complied while the intruder continued to point the gun at her. The intruder told the victim to lie down on her stomach, and he held a pillow over her head while he vaginally raped her. The intruder inserted his penis into the victim's vagina four times. The victim struggled to breathe while the pillow was on her head. The victim stated that the intruder ejaculated and wiped the semen off his body with a sock. The intruder then

4

told the victim to take a shower and "wash well." He stood next to the shower with his gun pointed at her.

After the victim got out of the shower, the intruder allowed her to get dressed and then asked if she had any electronics in her home. The victim gave him her cell phone and later saw that the television in her living room was gone. The intruder asked the victim if she wanted to live and told her that he would let her and her daughter live but that her granddaughter had caused "people a lot of pain." The intruder drove with the victim in her truck to the highway and asked the victim how much money she had in the bank, to which she replied, "Not much." The intruder then pulled into a gas station and let the victim get out of the truck. The victim walked to a friend's house nearby and called the police. At a local hospital, hospital personnel administered a rape kit on the victim, and she gave a statement to detectives. The victim had seen the Defendant wear a mask in her home before this incident and, based on her identification of the mask worn by the intruder who robbed and raped her, the victim determined that he was the Defendant. The intruder knowing her name and her granddaughter's name, as well as where the victim's daughter lived, indicated to her that he was the Defendant.

The victim stated that her vagina was torn as a result of the rape, and she was sore for three days. She stated that she did not consent to sex with the Defendant and that she was in fear for her life when he had the gun pointed at her.

On cross-examination, the victim testified that it was while she was showering that the Defendant took the television out of her living room and put it in her vehicle. She agreed that the statement she gave to law enforcement at the hospital on the night of the incident contained some inconsistencies compared to her testimony at trial. She agreed that she "caught" multiple mistakes in the statement, including the color of the mask worn during the sexual assault. The victim testified that she was in shock after being raped and after being held at gun point for over an hour, and that this explained some of her inconsistencies. She explained that the officer who took her statement did not write things exactly as she said them. The statement was given at approximately 4:00 a.m. The victim read over the statement in the weeks following the incident and realized some of the mistakes and informed the police of them.

The victim stated that, because the Defendant told her there was a contract on her granddaughter's head, she urged police to go to her daughter's house and check on their safety. The victim described the Defendant as having to stand on one leg like a dog while he raped her because there were so many items on the bed.

Cecelia Whiteaker testified that she was a nurse at the hospital where the victim was examined and spoke with the victim, who seemed anxious and nervous, in the

5

emergency room. The victim told Ms. Whiteaker that she had been assaulted by a masked gunman who had come into her house, taken her keys and money, and forced her to have sexual intercourse with him. Ms. Whiteaker testified to the victim's further statements to her, which were consistent with the victim's trial testimony. Ms. Whiteaker assisted in the victim's rape kit and agreed that the victim complained of being sore and in pain in her vaginal area during the exam.

On cross-examination, Ms. Whiteaker stated that she did not observe any marks or bruising on the victim's body.

Ben Altman testified that he was a physician at the hospital where the victim was treated and the trial court admitted Dr. Altman as an expert in the field of emergency medicine. Dr. Altman described the victim as anxious but not in distress when he encountered her at the hospital in the emergency room. He performed a physical examination of her vaginal area and observed a small tear at the opening of her vagina as well as some bleeding at the wound site. The victim complained to him of being sore. Based on his examination and the victim's statements to him, Dr. Altman determined that the victim had been assaulted and raped through vaginal intercourse.

On cross-examination, Dr. Altman agreed that he stated the victim was not in acute distress and that he did not observe other external trauma to the victim's body. He disagreed that bruising or injuries were usually present when a rape had occurred, and said he would not have expected more injury based on the victim's statement that she had been vaginally penetrated four times. He agreed that older people tended to bruise easily and that the tear to the victim's vagina and the bleeding could have occurred during consensual intercourse.

Cindy Adams, a detective with the Sullivan County Sheriff's Office, testified that she responded to the hospital to take custody of the rape kit results. She encountered the victim, whom she described as very upset and crying. Detective Adams took a statement from the victim, but had to stop several times due to the victim being upset or medical personnel entering the room; she described the scene as "chaotic."

Detective Adams later visited the Defendant's father's home, where she collected a mask from the Defendant's bedroom. She also went to the victim's truck and collected from it a television remote, another mask, and a pair of gloves. A bullet was also found on the floor of the victim's truck.

On cross-examination, Detective Adams stated that the victim was given her statement to review after it was taken by the police at the hospital. The victim made some changes to the statement and documented them in writing.

6

Matthew Price testified that he worked as a deputy for the Sullivan County Sheriff's Office and was asked to help locate the Defendant after he fled the scene of the victim's vehicle crash. Along with another deputy, Deputy Price eventually located the Defendant lying in a heavily wooded area behind a shopping center. Other law enforcement personnel searched the surrounding area where the Defendant was found and located a loaded gun close by.

Jonathan Carter, another law enforcement officer who apprehended the Defendant alongside Deputy Price, testified that, as he and Deputy Price pursued the Defendant in the area behind the shopping center, the Defendant could be seen holding a gun in his right hand. Photographs of the Defendant holding the gun were later recovered from the Defendant's cell phone.

Dr. Laura Boos testified as an expert in the field of forensic biology and stated that she analyzed the swabs taken from the Defendant and the victim and compared them to the DNA found on the gloves, mask, and to the vaginal swab taken from the victim. Tests revealed that DNA matching the Defendant's sample was present in the vaginal swab taken from the victim. On the mask and inside the gloves, Dr. Boos also found the Defendant's DNA.

Larry Stumbo testified that he was the Defendant's father and that he knew the victim because of her interactions with the Defendant. She had come to their home several times to pick up the Defendant. Mr. Stumbo said that the victim was not welcome in his home. He testified that the two masks involved in this case had been purchased by him for Halloween.

The Defendant testified that he was a convicted felon. He stated that he knew the victim because she was his ex-girlfriend's grandmother. He had spent the night at her house where the victim fed him and did his laundry. On February 6, 2014, the Defendant went to the victim's home where he testified she let him in the front door following which they had consensual sex in a bedroom. Later, the two got into the victim's vehicle and drove towards the apartment complex where the Defendant's ex-girlfriend was living with her mother. While in the vehicle, the Defendant and the victim got into a "heated argument" over the victim's granddaughter, his ex-girlfriend. Following their argument the Defendant dropped the victim off at a gas station.

The Defendant testified that at some point that evening, after he had dropped the victim off, a police officer attempted to pull over the vehicle while he was driving it and that he "ran from" the police officer. The Defendant stated that he evaded the police officer because he was afraid of going back to jail and because he had a firearm in the

vehicle. He also did not have a driver's license or a handgun permit at the time. After being apprehended by police, the Defendant told a detective that he had had sexual intercourse with the victim.

On cross-examination, the Defendant agreed that he had prior convictions for vandalism, burglary, grand larceny, conspiracy, felony possession of a firearm, and theft. The Defendant agreed that he was depicted holding a gun in the photographs admitted into evidence that, as a multiple convicted felon, he was barred by law from possessing the weapon.

Based upon this evidence, the jury convicted the Defendant of especially aggravated kidnapping, aggravated rape, aggravated robbery, aggravated burglary, employing a firearm during the commission of a dangerous felony, evading arrest, and possession of a handgun by a convicted felon.

## C. Sentencing

At the Defendant's sentencing hearing, the State introduced into evidence certified copies of the Defendant's prior convictions as well as the presentence report. No other evidence was presented. The trial court applied enhancement factor (4), that the victim was "particularly vulnerable because of age," based on the victim's being seventy-one years old at the time of the offense. The trial court applied enhancement factor (7), that the offense "was committed to gratify the defendant's desire for pleasure or excitement," based on the evidence that the Defendant ejaculated after raping the victim. The trial court stated that this factor was applicable only to the aggravated rape conviction. The trial court applied enhancement factor (8), that the Defendant "failed to comply with the conditions of a sentence involving release into the community," based on the evidence in the presentence report that he was on probation at the time this offense was committed. *See* T.C.A. §§ 40-35-114(4), (7), and (8) (2014). The trial court applied mitigating factor (13), that the Defendant voluntarily released the victim from confinement and that the Defendant suffered from a mental defect.

As to the especially aggravated kidnapping and aggravated rape convictions, both Class A felonies, the trial court imposed twenty-five year sentences at 100%. As to the aggravated robbery conviction, a Class B felony, the trial court imposed a twelve-year sentence to be served at 30%. As to the aggravated burglary conviction, a Class C felony, the trial court imposed a ten-year sentence to be served at 35%. As to the employing a firearm during the commission of a dangerous felony conviction, the trial court imposed a ten-year sentence to be served consecutively with the other convictions as mandated by statute to be served at 100%. As to the evading arrest conviction, the trial court imposed a four-year sentence to be served at 35%. Finally, as to the

possession of a handgun by a convicted felon conviction, the trial court imposed a four-year sentence to be served at 35%.

In consideration of consecutive sentencing, the trial court found that Tennessee Code Annotated section 40-35-115(b)(2) applied, that the Defendant had a record of criminal activity that was extensive. The trial court next applied factor (4), that the Defendant was a "dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." Finally, the trial court applied factor (6), that the Defendant was being sentenced for an offense committed while serving probation. *See* T.C.A. §§ 40-35-115(b)(2), (4), (6) (2014). The trial court ordered that the especially aggravated kidnapping and aggravated rape convictions be served consecutively, and noted again that the employing a firearm during the commission of a dangerous felony required consecutive sentencing, and therefore sentenced the Defendant to an effective sentence of sixty years.

It is from these judgments that the Defendant now appeals.

## II.   Analysis

On appeal, the Defendant contends that: (1) the trial court erred when it denied his motion to relieve counsel on the morning of trial; (2) the evidence is insufficient to sustain his convictions for especially aggravated kidnapping, aggravated rape, aggravated robbery, and aggravated burglary; (3) the trial court erred when it sentenced him for especially aggravated kidnapping and aggravated rape; and (4) the presentment in Count 5, the charge of employing a firearm during the commission of a dangerous felony, did not comply with the requirements found at T.C.A. § 39-17-1324, and thus, his conviction should be reversed.

### A.   Motion to Relieve Counsel

The Defendant contends that the trial court erred when it denied his motion to relieve counsel on the morning of trial. He contends that his counsels did not properly prepare for trial with him and attempted to coerce him into pleading guilty which created a conflict and broke the Defendant's trust in their ability to represent him. He argues that the conflict was irreconcilable. The State responds that the Defendant failed to establish good cause for removal, thus the trial court did not abuse its discretion. We agree with the State.

This court has previously set out a defendant's burden for showing he is entitled to the substitution of appointed counsel:

9

When an accused seeks to substitute counsel, the accused has the burden of establishing to the satisfaction of the trial judge that (a) the representation being furnished by counsel is ineffective, inadequate, and falls below the range of competency expected of defense counsel in criminal prosecutions, (b) the accused and appointed counsel have become embroiled in an irreconcilable conflict, or (c) there has been a complete breakdown in communications between them. Whether an accused is entitled to a substitution of counsel is a question which addresses itself to the sound discretion of the trial court.

*State v. Gilmore*, 823 S.W.2d 566, 568-69 (Tenn. Crim. App. 1991) (citations omitted).

The trial court considered the Defendant's *pro se*, oral motion to relieve counsel which he raised the morning of trial. The Defendant complained that his counsels had not met with him, were always busy when he called their offices, and were attempting to coerce him into pleading guilty. The trial court found that the Defendant was not credible and, citing the age of the case and the age of the victim, as well as the Defendant's having ample time to request new counsel before the trial date, declined to continue the case to allow new counsel to be appointed. The record supports this ruling. Other than his testimony, which the trial court found not to be credible, the Defendant did not establish that his relationship with counsels had reached the point of being irreconcilable. We would point out that a defendant's refusal to cooperate with competent appointed counsel did not entitle him to the appointment of other counsel. *State v. Rubio*, 746 S.W.2d 732, 736 (Tenn. Crim. App., Dec. 8, 1987) (citing *State v. McClennon*, 669 S.W.2d 705, 707 (Tenn. Crim. App. 1984)). A holding to the contrary "would allow the criminal defendant to control the court's docket and effectively prevent the trial from ever taking place." *Id.* Accordingly, we conclude that the trial court did not abuse its discretion in denying the Defendant's motion to relieve counsel.

### B. Sufficiency of Evidence

The Defendant contends that the evidence presented at trial is insufficient to sustain five of his convictions, as detailed below. When an accused challenges the sufficiency of the evidence, this court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e), *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In the absence of direct evidence, a criminal offense may be

10

established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted). "The standard of review [for sufficiency of the evidence] is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S .W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

## Count 1 – Especially Aggravated Kidnapping

Especially aggravated kidnapping, as relevant to this case, requires proof that the Defendant: (a) knowingly confined the victim so as to substantially interfere with her liberty; and (b) the confinement was accomplished through the use of a deadly weapon. T.C.A. § 39-13-305(a)(1) (2014). The evidence presented, viewed in the light most favorable to the State, was that the Defendant entered the victim's home while she was sleeping, and then, while wielding a gun and at times pointing it at the victim, confined the victim to her home and later to her vehicle. We conclude that this evidence was clearly sufficient for a rational jury to find beyond a reasonable doubt that the Defendant "knowingly" used a deadly weapon to unlawfully remove or confine the victim so as to substantially interfere with her liberty.

## Count 2 – Aggravated Rape

Aggravated rape is "unlawful sexual penetration of a victim by the defendant . . . accompanied by . . . force or coercion [] used to accomplish the act and the defendant is armed with a weapon or any article used or fashioned in a manner to lead the victim reasonably to believe it to be a weapon." T.C.A. § 39-13-502(a)(1) (2014).

The evidence presented was that the Defendant entered the victim's home and forced her at gunpoint into her vehicle. When the victim complained of being cold, she was allowed back inside to put on more clothes. While she was dressing, the Defendant ordered her to take her clothes off, smothered her head with a pillow, and proceeded to vaginally penetrate her with his penis four different times before he ejaculated on her. DNA evidence supported that the Defendant's semen was found inside the victim. The Defendant, who argued that the sex was consensual, was wielding a gun during the rapes. This is sufficient evidence from which a jury could conclude beyond a reasonable doubt that the Defendant was guilty of aggravated rape.

The Defendant asserts the evidence is insufficient to sustain this conviction because there was a lack of physical injury to the victim to show that she had been penetrated four times. This lack of injury, he contends, is proof that this was a consensual sexual encounter. The proof supported that the victim had a vaginal tear from which she was bleeding but no further injury. The examining physician testified that the lack of further injury was not necessarily indicative of a consensual encounter. This court has held that the lack of physical injury is not a basis upon which to conclude that no rape occurred. *See State v. Deangelo Norton*, No. W2017-02069-CCA-R3-CD, 2017 WL 2817661, at *6 (Tenn. Crim. App., at Jackson, June 29, 2017) (citing *State v. Smith*, 42 S.W.3d 101, 106 (Tenn. Crim. App. 2000) for the conclusion that the victim's testimony alone is sufficient to support an aggravated sexual battery conviction, and the lack of physical corroboration is inapposite), *perm. app. denied* (Tenn. Sept. 22, 2017).

12

The evidence supports the verdict, and the Defendant is not entitled to relief on this issue.

## Count 3 - Aggravated Robbery

Aggravated robbery is the "intentional or knowing theft of property from the person of another by violence or putting the person in fear . . . accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." T.C.A. § 39-13-401; 402(a)(1) (2014).

The evidence presented was that the Defendant took the victim's television without her consent from her living room and put it into her vehicle; this was accomplished while the Defendant wielded the weapon. The television was later found in the backseat of the victim's vehicle, which the Defendant had driven away from her home, also while brandishing the weapon. This is sufficient evidence from which a jury could conclude that the Defendant was guilty of aggravated robbery

## Count 4 – Aggravated Burglary

Aggravated burglary is defined as the burglary of a habitation. T.C.A. § 39-14-403 (2014). Burglary is defined as entering, without the owner's effective consent, a building "not open to the public, with the intent to commit a felony, theft, or assault[.]" T.C.A. § 39-14-402(a)(1) (2014). A habitation is "any structure . . . designed or adapted for the overnight accommodation of persons[.]" T.C.A. § 39-14-401(1)(A) (2014).

The evidence presented was that the Defendant entered the victim's home through a locked door while the victim was sleeping. He woke the victim in her bed while pointing a gun at her, and later robbed, raped, and kidnapped her. This is sufficient evidence from which a jury could find beyond a reasonable doubt that the Defendant was guilty of the charged offense.

The Defendant argues that his convictions are unsupported by the evidence because there were contradictions between the victim's statements to police and medical personnel and her trial testimony. He specifically points to her testimony that the Defendant stood on one leg when committing the rape, a statement she did not provide to investigators or law enforcement. The jury heard the victim's and the Defendant's version of what occurred and was entitled to decide and resolve for itself any inconsistencies in the evidence presented. By its verdict, the jury chose to accredit the victim's testimony at trial and we will not re-weigh this finding. *See Bland*, 958 S.W.2d at 659. The Defendant is not entitled to relief on this issue.

13

## C.   Sentencing for Especially Aggravated Kidnapping and Aggravated Rape

The Defendant next contends that the trial court erred when it sentenced him for especially aggravated kidnapping because the facts were "not so heinous and shocking compared to other convictions for this offense," because the victim suffered minimal bodily injuries, and because the Defendant released the victim after a short duration of deprivation of her liberty.   Thus, he contends, the trial court's imposition of the maximum allowable sentence was not justified by the circumstances of the offense.   As for his sentence for aggravated rape, he contends that the trial court erred when it ordered this sentence be served consecutively, particularly because the total effective sentence and release eligibility equated to a sentence greater than that of life with the possibility of parole.   The State responds that the trial court properly considered the principles of sentencing and the facts of the case and did not abuse its discretion when it imposed the Defendant's sentences.

The Tennessee Criminal Sentencing Reform Act of 1989 and its amendments describe the process for determining the appropriate length of a defendant's sentence and the manner of service of that sentence.   In *State v. Bise,* the Tennessee Supreme Court reviewed changes in sentencing law and the impact on appellate review of sentencing decisions.   380 S.W.3d 682 (Tenn. 2012).   The Tennessee Supreme Court announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" *Id.*   A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'"   *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)).   To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision.   *Id*.; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980).   The reviewing court should uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute."   *Bise*, 380 S.W.3d at 709-10.   So long as the trial court sentences within the appropriate range and properly applies the purposes and principles of the Sentencing Act, its decision will be granted a presumption of reasonableness.   *Id.* at 707.   We are to also recognize that the defendant bears "the burden of demonstrating that the sentence is improper."   *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by

the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* T.C.A. § 40-35-210 (2010); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).

Tennessee Code Annotated section 40-35-115(b) provides that a trial court may order sentences to run consecutively if it finds any one of the statutory criteria by a preponderance of the evidence. As it relates to this case, the trial court found the following criteria applicable:

> (2) The defendant is an offender whose record of criminal activity is extensive;
>
>     . . . .
>
> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high;
>
>     . . . .
>
> (6) The defendant is sentenced for an offense committed while on probation.

T.C.A. §§ 40-35-115(b)(2), (4), and (6). The imposition of consecutive sentencing is subject to general sentencing principles that the overall sentence imposed "should be no greater than that deserved for the offense committed" and that it "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed[.]" T.C.A. §§ 40-35-103(2), (4). In addition to these criteria, "consecutive sentencing is guided by the general sentencing principles providing that the length of a sentence be 'justly deserved in relation to the seriousness of the offense' and 'no greater than that deserved for the offense committed,'" although specific factual findings are not necessary. *State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002); *see also* T.C.A. §§ 40-35-102(1), -103(2); *In re Sneed*, 302 S.W.3d 825, 828-29 (Tenn. 2010). We review a trial court's decision to impose consecutive sentences for an abuse of discretion. *State v. Pollard*, 432 S.W.3d 851 (Tenn. 2013).

We find without merit the Defendant's contention that the trial court improperly sentenced him for his kidnapping and rape convictions. He argues that the level of

15

heinousness does not justify the imposition of the maximum allowable sentence, twenty-five years. The trial court considered the relevant principles and sentenced the Defendant to a within range sentence. It properly applied enhancement factor (4) on the basis of the victim's advanced age, seventy-one years at the time of the crime, as well as enhancement factor (7), based on the evidence that the Defendant ejaculated. Finally, it properly applied enhancement factor (8) on the basis that the Defendant was on probation at the time of the offenses. *See* T.C.A. §§ 40-35-114(4), (7), and (8) (2014). The trial court also considered two factors, the release of the victim and the Defendant's mental health issues, as mitigation. We conclude that the trial court properly enhanced the Defendant's sentence when it ordered the maximum within range sentence for this conviction.

The Defendant also argues that his crimes do not justify consecutive sentencing. The evidence was that Defendant held a seventy-one-year-old woman at gunpoint inside her own home in the middle of the night while he raped her and threatened her family. Based on this evidence, we conclude that the length of the Defendant's sentence is justly deserved in relation to the seriousness of these offenses, and is no greater than that deserved for the offenses committed. The trial court did not order that the sentences for all of the Defendant's convictions run consecutively. It instead ordered that two of the six sentences run consecutively, for a total of fifty years. An additional sentence of ten years was mandated by law to run consecutively to the Defendant's other convictions, which we have addressed below. We conclude the trial court did not err when it imposed a sixty-year sentence or when it ordered partial consecutive sentencing. The Defendant is not entitled to relief on this issue.

### D. Employing a Firearm during the Commission of a Dangerous Felony

Lastly, the Defendant contends that Count 5 of the presentment, charging the offense of employment of a firearm during the commission of a dangerous felony pursuant to Tennessee Code Annotated section 39-17-1324, does not allege an underlying dangerous felony conviction as required for the "mandatory" ten-year sentence imposed by the trial court. He asks this court to dismiss the conviction. The State concedes that the indictment fails to list a requisite prior dangerous felony conviction but contends that resentencing on this count alone is the appropriate remedy. We agree with the State.

It is an offense to employ a firearm during the commission of a dangerous felony or the attempt to commit a dangerous felony. T.C.A. § 39-17-1324(b)(1), (2). The sentence for this offense is enhanced if the defendant has a prior felony conviction. § 39-17-1324(h)(2). Recent case law interpreted the statutory language to mean that the underlying felony conviction be classified as "dangerous," in accordance with those listed in section 39-17-1324(i)(1). *See Josh L. Bowman v. State*, No.

E2016-01028-CCA-R3-PC, 2017 WL 1449232 at *6 (Tenn. Crim. App., at Knoxville, April 24, 2017) (summarizing the legislative history and interpreting the statutory scheme of Tennessee Code Annotated sections 39-17-1324(f), (g), (h), (i), and (j), and the statutory definition of "prior felony conviction," as amended by the legislature in 2007), *perm. app. denied* (Tenn. Aug. 16, 2017).

The Defendant was sentenced under subsection (h)(2), as noted by the trial court when it stated that it was required to sentence the Defendant to a ten-year minimum sentence. However, none of the Defendant's prior felony convictions listed in the presentment are dangerous felonies as contemplated by subsection (i)(1), and thus we agree that his sentence was improperly enhanced to a ten-year mandated minimum sentence in accordance with subsection (h)(2). Six years is the mandatory minimum sentence for this offense if a defendant has no prior dangerous felony convictions. § 39-17-1324(h)(1). If the trial court based its ten-year sentence solely upon its statement that the mandatory minimum sentence is ten-years pursuant to Tennessee Code Annotated section 39-17-1324(h)(2), then it did not follow the sentencing procedures articulated in Tennessee Code Annotated section 39-17-1324(f) (requiring that the trier of fact be presented in a bifurcated hearing proof that the defendant first, employed or possessed a firearm during the commission of the underlying act, and then, proof that the defendant has a qualifying prior felony conviction pursuant to the statute). The State asserts, and we agree, that the proper remedy for this error in sentencing the Defendant for this conviction is for this court to vacate the sentence for this conviction and remand the case to the trial court for resentencing on this count. The trial court's sentencing determinations are affirmed in all other regards.

## III. Conclusion

Based on the above mentioned reasoning and authorities, we affirm the trial court's judgments, with the exception of the sentence imposed in Count 5. In Count 5, we vacate the sentence for the employing a firearm during the commission of a dangerous felony conviction and remand the case to the trial court for resentencing on that count.

_____
ROBERT W. WEDEMEYER, JUDGE

17